**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| NANCY LAYTON, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 6:26-cv-141-JDK |
| | § | |
| SMITH COUNTY, TEXAS, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

This case arises out of the tragic death of Jonathan Layton by a Smith County Deputy Sheriff. Plaintiffs bring claims under 42 U.S.C. § 1983 and state law against Deputy Braylon J. Barnes, Sheriff Larry Smith, and Smith County. Defendants now move to dismiss the action under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Docket No. 197. As explained below, the motion is **GRANTED in part** and **DENIED in part**.

**I.**

As required by established law, the Court accepts as true Plaintiffs' well-pleaded facts and views them in the light most favorable to Plaintiffs. *See, e.g.*, *Raj v. La. State Univ.*, 714 F.3d 322, 330 (5th Cir. 2013).

On November 5, 2024, FaithCo Plumbing, LLC fired Jonathan Layton from his job as a plumber's apprentice. Docket No. 187 ¶¶ 22, 25. As Jonathan collected his belongings, the parties began to dispute the ownership of some tools. *Id.* ¶ 26. Jonathan allegedly ended the conversation by saying that he had "something that will take care of this at home." *Id.* Plaintiffs argue that Jonathan's comments could

have referenced receipts at home or even text messages with co-workers. *Id.* ¶ 29. Jonathan's former employer, however, understood the comment differently. Shortly thereafter, the employer called 911. *Id.* ¶ 30. Smith County dispatched Deputy Braylon Barnes to the scene. *Id.* ¶ 34. Barnes engaged in a brief conversation with the employer, who told Barnes about Jonathan's statement, said that Jonathan had been "shaking real bad," and explained that "Jonathan is a little off so uh, I just need to call someone, you know." *Id.* ¶ 35. The employer then provided Barnes with Jonathan's home address. *Id.* ¶ 36.

Barnes drove to Jonathan's home, where he was met by another deputy. *Id.* ¶¶ 56–64. After the pair knocked and announced themselves, Jonathan's brother, Freddie Layton, Jr. answered the door. *Id.* ¶ 82. Deputy Raj Baran, the other officer present, asked whether "Mr. Layton" was home, and a moment later, Jonathan appeared behind Freddie. *Id.* ¶¶ 83–84. Jonathan held a handgun by his right side, with his finger outside the trigger guard. *Id.* ¶¶ 88, 90. Deputy Baran instructed Jonathan to drop the gun. *Id.* ¶ 96. Almost immediately, Barnes drew his handgun and shot at Jonathan as Jonathan began to turn away from the officers. *Id.* ¶¶ 104–08. Deputy Barnes ultimately fired four rounds and hit Jonathan three times—twice in his left side and once in his back. *Id.* ¶ 109. Jonathan died as a result.

**II.**

Rule 12(b)(1) authorizes the dismissal of a case for lack of subject matter jurisdiction when the Court lacks the statutory and constitutional power to adjudicate the case. FED. R. CIV. P. 12(b)(1); *Home Builders Ass'n of Miss., Inc. v. City*

*of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). When a defendant files a dismissal motion under Rule 12(b)(1), the plaintiff bears the burden to establish subject matter jurisdiction. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). A court should grant a Rule 12(b)(1) dismissal motion "only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Id.* (citing *Home Builders Ass'n of Miss.*, 143 F.3d at 1010). Under Rule 12(b)(6), a party may seek dismissal for failure to state a claim upon which relief can be granted. In reviewing a Rule 12(b)(6) motion, a court must accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). While a court must view the pleadings in a light favorable to the plaintiff, it should not strain to find inferences favorable to the plaintiff and should not accept conclusory allegations, unwarranted deductions, or legal conclusions. *See R2 Invs. LDC v. Phillips,* 401 F.3d 638, 642 (5th Cir. 2005). In other words, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Fernandez–Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993).

**III.**

Plaintiffs assert multiple claims against Deputy Barnes, Smith County, and Sheriff Smith. Defendants move for dismissal under Rules 12(b)(1) and 12(b)(6). The Court addresses each count in turn.

**A.**

Count I alleges that Deputy Barnes violated Jonathan's Fourth Amendment rights by using excessive force. Defendants assert qualified immunity: "Plaintiffs fail to plead facts which overcome Deputy Barnes['s] qualified immunity from claims under the Fourth Amendment." Docket No. 197 at 7–13. After analyzing the pleading and reviewing the video evidence, however, the Court concludes that Deputy Barnes is not entitled to qualified immunity at this stage of the proceeding.

**1.**

When confronted with a qualified-immunity defense at the motion to dismiss stage, a plaintiff must plead sufficient facts that, if proven true, would defeat the officer's immunity claim. *Santander v. Salazar*, 133 F.4th 471, 478 (5th Cir. 2025) (citing *Guerra v. Castillo*, 82 F.4th 278, 285 (5th Cir. 2023)). A plaintiff may defeat the claim by alleging "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Ultimately, the plaintiff bears the burden to rebut the assertion of qualified immunity at this stage. *See Smith v. Heap*, 31 F.4th 905, 910 (5th Cir. 2022).

Still, the Fifth Circuit has repeatedly held that "an assertion of qualified immunity . . . does not subject the complaint to a heightened pleading standard." *Santander*, 133 F.4th at 478 (quoting *Arnold v. Williams*, 979 F.3d 262, 267 (5th Cir. 2020)); *see also Green v. Thomas*, 129 F.4th 877, 883 (5th Cir. 2025) ("[T]he same standards apply when a motion to dismiss is based on qualified immunity."). At the

pleadings stage, "'the district court must'—as always—do no more than determine whether the plaintiff has 'file[d] a short and plain statement of his complaint, a statement that rests on more than conclusions alone.'" *Anderson v. Valdez*, 845 F.3d 580, 589–90 (5th Cir. 2016) (quoting *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995)). Like in other contexts "a plaintiff cannot be allowed to rest on general characterizations, but must speak to the factual particulars of the alleged actions, at least when those facts are known to the plaintiff and are not peculiarly within the knowledge of defendants." *Schultea*, 47 F.3d at 1432.

In addition, "where video recordings are included in the pleadings, as is the case here, the video depictions of events, viewed in the light most favorable to the plaintiff, should be adopted over the factual allegations in the complaint if the video 'blatantly contradict[s]' those allegations." *Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021). In other words, "where a party 'referenced the video in their complaint and brief' and 'included several screenshots from the video in their complaint,' 'caselaw supports our consideration of the video'" in resolving a motion to dismiss. *Anderson v. Estrada*, 140 F.4th 634, 642 (5th Cir. 2025) (quoting *Winder v. Gallardo*, 118 F.4th 638, 643–44 (5th Cir. 2024) (per curiam)).

**2.**

Defendants first argue that Plaintiffs "have not alleged facts which show an excessive force claim under the Fourth Amendment." Docket No. 197 at 7. According to Defendants, "an objective officer could reasonably have believed shooting

[Jonathan] was necessary to stop the serious risk of harm [Jonathan's] actions precipitated." *Id.* at 8.

The Fourth Amendment safeguards the "right of the people to be secure in their persons" against "unreasonable . . . seizures." U.S. CONST. amend. IV. Accordingly, a "claim that a law enforcement officer used excessive force during a stop or arrest is 'analyzed under the Fourth Amendment.'" *Barnes v. Felix*, 605 U.S. 73, 79 (2025) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). A plaintiff stating an excessive force claim must allege: "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)). "[T]he touchstone of [this] inquiry is simply the reasonableness of the force employed." *Buehler v. Dear*, 27 F.4th 969, 981 (5th Cir. 2022). That inquiry into reasonableness must account for the "totality of the circumstances." *Barnes*, 605 U.S. at 73 (quoting *County of Los Angeles v. Mendez*, 581 U.S. 420, 427–28 (2017)). And it must also be based on "the perspective of a reasonable officer on the scene." *Id.* at 79 (quoting *Graham*, 490 U.S. at 396). In other words, "deciding whether a use of force was objectively reasonable demands 'careful attention to the facts and circumstances' relating to the incident, as then known to the officer." *Id.* at 80 (quoting *Graham*, 490 U.S. at 396).

Here, Defendants contest only the second and third elements of Plaintiffs' Fourth Amendment claim, which are generally analyzed together. *See Solis v. Serrett*, 31 F.4th 975, 982 (5th Cir. 2022). Courts apply several non-exclusive

considerations, often referred to as the *Graham* factors, to examine the reasonableness of force used: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham*, 490 U.S. at 396); *see also Tuttle v. Gallegos*, 180 F.4th 209, 222 (5th Cir. 2026) (same). And although it's not a *Graham* factor, courts also consider "the speed with which officers resort to force." *Solis*, 31 F.4th at 983. Finally, the "'objective reasonableness' balancing test is constrained" in deadly force cases like this one. *Batyukova v. Doege*, 994 F.3d 717, 725 (5th Cir. 2021). An officer's use of deadly force is excessive "unless 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

Considering the totality of the circumstances here, and informed by the factors above, the Court finds that Plaintiffs have plausibly alleged that Deputy Barnes's use of force was unreasonable and excessive. First, the "severity of the crime" weighs in Deputy Barnes's favor. Although Jonathan's statement to his employer was vague, *see* Docket No. 187 ¶ 35 ("I got something at home and I can take care of all y'all."), the employer believed that Jonathan was threatening him and others. The employer told Deputy Barnes, moreover, that he had just fired Jonathan, that Jonathan "got mad" and was "shaking real bad," and that Jonathan seemed "a little off." *Id.* When Deputy Barnes encountered Jonathan approximately twenty minutes after Jonathan

left the scene, Jonathan came to the door with a gun in his hand. Docket No. 197 ¶ 11, 12. Thus, although it's unclear whether Jonathan had committed any crime, the crime alleged here—threatening to injure or kill others—is "severe." *Cf. Solis*, 31 F.4th at 982 (traffic violation and public intoxication were not "severe").

The second *Graham* factor—whether Jonathan posed an immediate threat to the safety of the officers or others—cuts in favor of Plaintiffs. To be sure, Jonathan answered the door with a gun in his hand, but "[m]erely having a gun in one's hand does not mean *per se* that one is dangerous." *Graves v. Zachary*, 277 F. App'x 344, 348 (5th Cir. 2008). And viewing the facts in the light most favorable to Plaintiffs, there is no indication that Jonathan knew officers were present when he answered the door; and therefore, there is no indication that he was attempting to threaten the officers with his weapon. Further, when Deputy Barnes encountered him, Jonathan was in the doorway of his own home, far from his former workplace where he had allegedly threatened others. Nor did Jonathan threaten the officers. He kept the firearm pointed downward, placed his finger outside the trigger guard, and remained in the doorway. Critically, when Deputy Baran told Jonathan to put the gun down, Jonathan began to retreat *away* from the officers rather than move closer toward them. Docket No. 187 ¶¶ 96, 100, 106. Indeed, in the video, Jonathan appears to be attempting to comply with Deputy Baran's directive by moving away from the door to put away the firearm. Certainly, at no point did Jonathan raise the gun toward the officers or otherwise display aggression toward them. In fact, Jonathan was shot in his side and back as he was turning away from the officers. "Common sense, and

the law, tells us that a suspect is less of a threat when he is turning or moving away from the officer." *Poole v. City of Shreveport*, 13 F.4th 420, 425 (5th Cir. 2021).

The third *Graham* factor—whether Jonathan was actively resisting arrest or attempting to evade arrest by flight—also cuts in favor of Plaintiffs. As noted, Deputy Baran had just told Jonathan to put the gun down, and Jonathan began to turn away from the officers. Viewing the facts in the light most favorable to Plaintiffs, one could conclude that Jonathan was beginning to put the gun away. And, although "it may be objectively reasonable . . . for police officers to use physical force when a person refuses to comply with an officer's lawful commands," it is unreasonable to do so "after that person has begun to comply." *Bagley v. Guillen*, 90 F.4th 799, 800 (5th Cir. 2024). In any event, by turning briefly away from the officers, Jonathan was not clearly resisting or evading arrest. Here, moreover, "the quickness with which the officers resorted" to force "militates against a finding of reasonableness." *Trammell*, 868 F.3d at 342; *see also Garner*, 471 U.S. at 11–12 (holding that officers must provide a warning before deadly force when feasible). The video indicates that Deputy Barnes began firing at Jonathan almost immediately after Deputy Baran's warning and just as Jonathan began to turn away from the officers.

Based on these facts and after weighing the *Graham* factors, the Court concludes that Deputy Barnes's use of deadly force was unreasonable. When Deputy Barnes began shooting, no reasonable officer would have had probable cause to believe that Jonathan posed a threat of serious physical harm, either to Deputy

Barnes or to others. *See Romero*, 888 F.3d at 176 (citing *Garner*, 471 U.S. at 11); *see also Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. 2019) (en banc).

Accordingly, Plaintiffs have adequately pleaded that Deputy Barnes unreasonably used excessive force in violation of the Fourth Amendment.

**3.**

The Court must next consider whether this right was clearly established at the time of the incident. A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Cope v. Cogdill*, 3 F.4th 198, 204 (5th Cir. 2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). Courts must avoid any temptation to define this right at a high level of generality, as this "protect[s] the desired balance at which the qualified-immunity doctrine aims." *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 337 (5th Cir. 2020); *Solis*, 31 F.4th at 984 (A right is clearly established where there is "controlling authority" that "defines the contours of the right in question with a high degree of particularity."). The right must therefore "be defined at the appropriate level of specificity." *Bartlett*, 981 F.3d at 337. For the Court to deny qualified immunity at this stage, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)). The caselaw must therefore "'squarely govern[ ]' the specific facts at issue,

such that only someone who is 'plainly incompetent' or who 'knowingly violates the law' would have behaved as the official did." *Id.* (quoting *Mullenix*, 577 U.S. at 15).

In *Morrow v. Meachum*, the Fifth Circuit identified "four applicable commandments" to guide a court's analysis of clearly established law. 917 F.3d 870, 874 (5th Cir. 2019). First, courts "must frame the constitutional question with specificity and granularity." *Id.* at 874–75. "Second, clearly established law comes from holdings, not dicta." *Id.* at 875. "Third, overcoming qualified immunity is especially difficult in excessive-force cases." *Id.* at 876. And fourth, courts "must think twice before denying qualified immunity." *Id.*

The Fifth Circuit, moreover, has held that a plaintiff may "'identify a case' or 'body of relevant case law' in which 'an officer acting under similar circumstances . . . was held to have violated the [Constitution.]'" *Batyukova*, 994 F.3d at 726 (quoting *Bartlett*, 981 F.3d at 330). "This approach 'do[es] not require a case directly on point,' but 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft*, 563 U.S. at 741).

Applying this precedent here, the Court holds that Plaintiffs have alleged facts "that, if true, would permit the inference" that they will "overcome [Deputy Barnes's] qualified immunity defense." *See Hinojosa v. Livingston*, 807 F.3d 657, 664 (5th Cir. 2015). Cognizant of the Fifth Circuit's rigorous commandments, the Court does not make this holding lightly. But in November 2024, it was "clearly established" that it was unlawful to shoot a person in the doorway of his home while he held a gun at his side and turned away from the officers to comply with their directive to put the gun

down. *See Cole*, 935 F.3d at 453, 455; *Bagley v. Guillen*, 90 F.4th 799, 800 (5th Cir. 2024); *Darden v. City of Fort Worth*, 880 F.3d 722, 730 (5th Cir. 2018) (finding that Fifth Circuit case law clearly established that an officer may not resort to violent force when a suspect's "behavior did not rise to the level of 'active resistance'"). In *Cole*, for example, the Fifth Circuit held that officers violated clearly established law when they shot a mentally disturbed teenager who pointed a gun at his own head, away from the officers, and was unaware of the officers' presence because no warning was given before opening fire. 935 F.3d at 453. Similarly here, the officers could have reasonably believed Jonathan was mentally disturbed, Jonathan pointed his gun away from the officers, and, although a warning was technically given, Deputy Barnes began firing at Jonathan within two seconds of the warning and while Jonathan appeared to be complying. *Cf. Kisela v. Hughes*, 584 U.S. 100, 105–07 (2018) (finding no clearly established rule that the officer's conduct was unlawful when officers gave repeated warnings).

Under these circumstances, only someone "who is 'plainly incompetent' or who 'knowingly violates the law' would have behaved" as Deputy Barnes did. *Bartlett*, 981 F.3d at 337 (quoting *Mullenix*, 577 U.S. at 15).

* * *

In sum, Plaintiffs have alleged a violation of a clearly established constitutional right and have thus overcome Deputy Barnes's entitlement to qualified immunity at this stage of the proceeding.

Defendants also argue that no Plaintiff has standing to recover punitive damages under Texas's Wrongful Death Statute under Count I. Docket No. 197 ¶ 19. In this case, only Nancy Layton seeks to recover damages under this statute. Docket No. 187 ¶ 343. But according to Texas law, parents cannot recover punitive damages under this provision. *See Smith v. YRC Inc.,* 2019 WL 13218268, at *3 (E.D. Tex. Oct. 18, 2019) (listing several cases). Therefore, to the extent Plaintiffs seek punitive damages on behalf of Nancy under the Texas Wrongful Death Act, their claims are barred under Texas law.

**B.**

Count II alleges that Deputy Barnes violated Nancy and Freddie Layton's "substantive due process rights under the Fourteenth Amendment" by firing into their home and thus "nearly kill[ing]" them. Docket No. 187 ¶¶ 349–64. Defendants again assert qualified immunity on behalf of Deputy Barnes. Docket No. 197 at 13–16.

As an initial matter, although Plaintiffs contend that this claim arises "under substantive due process rather than the Fourth Amendment," Docket No. 200 at 13, they also allege that Nancy and Freddie were seized as a result of Deputy Barnes's allegedly "objectively unreasonable" "use of force," Docket No. 187 ¶¶ 355–357. And they allege that this "[e]xcessive police force may violate the Fourth Amendment's prohibition of unreasonable seizures." *Id.* ¶ 357. Excessive force claims "must be analyzed under the Fourth Amendment when that more specific constitutional provision applies." *Estate of Parker v. Miss. Dep't of Pub. Safety*, 140 F.4th 226, 244

(5th Cir. 2025) (rejecting substantive due process claim when "the parties do not dispute that a seizure occurred" and thus "the Fourth Amendment governs"); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (citation modified) ("[W]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."). "That alone forecloses Plaintiffs' Fourteenth Amendment claims." *Estate of Parker*, 140 F.4th at 244.

Even if Nancy and Freddie Layton could proceed under the Fourteenth Amendment, they have not pleaded sufficient facts to state a substantive due process claim. The Fourteenth Amendment forbids any State from depriving a person of "life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1; *see also Estate of Parker*, 140 F.4th at 244. In general, "only the most extreme use of force violates the Fourteenth Amendment—namely, actions that 'can properly be characterized as arbitrary[ ] or conscience shocking.'" *Estate of Parker*, 140 F.4th at 244 (quoting *Collins v. City of Harker Heights,* 503 U.S. 115, 128 (1992)). "This is a deliberately high bar." *Id.* "Conduct shocks the conscience only when it is 'so "brutal" and "offensive" that it d[oes] not comport with traditional ideas of fair play and decency.'" *Id.* (quoting *Lewis*, 523 U.S. at 847). "Indeed, 'even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates' constitutional protections." *Id.* (quoting *Lewis*, 523 U.S. at 853). "A purpose to cause [the] harm is needed . . . ." *Id.* (quoting *Lewis*, 523 U.S. at 854).

Nothing in Deputy Barnes's conduct meets this demanding threshold. Firing at a person holding a gun when the officer has reason to believe the person made threats against others may be unlawful under the Fourth Amendment, but it is "not the kind of arbitrary or conscience-shocking conduct" that creates a substantive due process violation. *Id.* Nor do Plaintiffs allege that Deputy Barnes intended to harm Nancy or Freddie by shooting Jonathan. Nancy was not in the same room when Deputy Barnes shot Jonathan, and Freddie was standing to the side and was not hit. In *Estate of Parker*, the Fifth Circuit held that an officer's ramming a suspect's car to end a pursuit did not violate the substantive due process rights of the car's passengers where the allegations amounted at most to "reckless endangerment." *Id.* at 244–45; *see also id.* at 245 ("firing at an active shooter using a human shield is likewise neither arbitrary nor conscience-shocking" even where the officer shot and killed an infant held by the suspect). So too here. Although Deputy Barnes's alleged conduct may have been reckless, it is not so conscience-shocking as to meet the "deliberately high bar" of stating a substantive due process claim. *Id.* at 244.

Plaintiffs' cases are inapposite. In *Petta v. Rivera*, the Fifth Circuit found that an officer escalated a minor traffic stop based on "malice rather than merely careless or unwise excess of zeal." 143 F.3d 895, 897–98, 902–03 (5th Cir. 1998) (noting that the officer made aggressive remarks and ultimately disregarded the safety of children by shooting into their parent's vehicle). Here, in contrast, Plaintiffs have not alleged that Deputy Barnes acted out of malice, rather than mere recklessness. Similarly, in *Coon v. Ledbetter*, the court held that a suspect's young daughter could bring a civil

rights claim against an officer who fired into a trailer with the daughter inside, noting that the officer put the daughter in tremendous risk and continued to shoot after the suspect "staggered into his trailer . . . [and] attempted to protect [his daughter] from gunfire." 780 F.2d 1158, 1160–61 (5th Cir. 1986). Freddie and Nancy are not alleged to have experienced that same level of direct risk.

Having not alleged a constitutional violation, Plaintiffs fail at step one of the qualified-immunity analysis. Count II is therefore dismissed.

**C.**

Count III asserts a municipal liability claim against Smith County. According to Plaintiffs, the Smith County Sheriff's Office had a policy or custom of hiring and retaining officers with disciplinary histories, Docket No. 187 ¶¶ 279, 285, and failing to properly train and supervise its deputies, Docket No. 187 ¶¶ 252, 265, 335. Plaintiffs also allege that the County "publicly defended and ratified Barnes'[s] conduct" in subsequent statements to the media and by failing to conduct a genuine administrative review. *Id.* ¶¶ 396–97. The Court first explains the law and then addresses each theory in turn.

**1.**

Smith County, as a municipality, cannot be held liable under § 1983 based on vicarious or respondeat superior liability. *See, e.g.*, *Hicks-Fields v. Harris County*, 860 F.3d 803, 808, 811 (5th Cir. 2017). Rather, a municipality may be liable only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and

promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Put differently, to satisfy *Monell* a plaintiff must allege: "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002). Plaintiffs here do not identify an official written policy, but instead assert that Smith County engaged in "practices so persistent and widespread as to practically have the force of law." *Hicks-Fields*, 860 F.3d at 808 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).

To satisfy this standard, Plaintiffs must allege "[a] persistent, widespread practice of [County] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Id.* (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)). "A successful showing of such a pattern requires similarity and specificity; prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question." *Id.* (citation modified). *See also, e.g., Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001) (Under the first prong of municipal liability, plaintiffs must demonstrate either an officially promulgated policy or a widespread custom or practice "so common and well-settled as to constitute a custom that fairly represents municipal policy." (quoting *Webster*, 735 F.2d at 841)).

Plaintiffs must then allege "'[a]ctual or constructive knowledge of such custom'

by the municipality or the official who had policymaking authority." *Hicks-Fields*, 860 F.3d at 808 (quoting *Webster*, 735 F.2d at 841). And Plaintiffs finally must allege that the policy or custom was the "moving force" behind the constitutional violation. *Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010) (quoting *Pineda*, 291 F.3d at 328). In other words, a plaintiff "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* at 542 (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)).

Stating a *Monell* claim against a municipality like Smith County is therefore a "high bar." *Hicks-Fields*, 860 F.3d at 810. If it were otherwise, municipalities would be "[held] liable on the theory of respondeat superior, which is expressly prohibited by *Monell*." *Id.* at 811 (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 852 (5th Cir. 2009)).

**2.**

Plaintiffs first allege that Smith County had a practice or custom of hiring and retaining officers with "disciplinary . . . red flags." Docket No. 187 ¶¶ 279–325, 371–77. Plaintiffs call these individuals "gypsy officer[s]," which they define as officers "who move[ ] from agency to agency under a disciplinary cloud, seeking a department willing to overlook disqualifying red flags." *Id.* ¶ 225. Plaintiffs allege that Deputy Barnes is a "gypsy officer" because he "repeatedly applied to numerous departments and was repeatedly not selected, disqualified, rejected, or screened out." *Id.*; *see also id.* ¶ 223 (alleging that Barnes "repeatedly failed exams and was ultimately dismissed

from [the Fort Worth Police Department cadet] program"); *id.* ¶¶ 233–37 (alleging that Barnes resigned from the Tyler Police Department, "rather than remain and face termination," and then applied unsuccessfully to several other police departments).

**a.**

To establish this "pattern," Plaintiffs identify more than a dozen Smith County officers, some of whom allegedly committed misconduct while employed by the County and—at least some of whom—had questionable employment backgrounds. *See id.* ¶¶ 286–322. The problem for Plaintiffs, however, is that the alleged misconduct is all over the place. For example, one officer is alleged to have "placed the barrel of his firearm against the head of a non-resisting suspect," while another allegedly "warned [a] suspect of an anticipated SWAT operation," and still another "performed a leg sweep on a handcuffed DWI suspect." *Id.* ¶¶ 286, 288, 292. Some of the officers did not commit any misconduct, according to the complaint, and none were involved in a deadly-force incident.

The officers' employment backgrounds are also dissimilar. One was allegedly the "subject of [an] internal review concerning force," one had a "prior hit-and-run offense [and a related] employment gap," and another "was fired from Tyler PD for lying in an internal affairs investigation." *Id.* ¶¶ 287, 291, 306. Many of the identified officers were hired by Smith County despite having been disciplined or terminated by other law enforcement agencies—for a variety of reasons, including "prior theft-by-check charges," "inaccuracies and missed deadlines," "family violence," "rules-of-conduct violations," "use of force violations," and "conducting unsanctioned police

work in another jurisdiction." *See id.* ¶¶ 308–14. None of the officers, however, have a background similar to Deputy Barnes.

As noted above, alleging a custom or practice "requires 'sufficiently numerous prior incidents,' as opposed to 'isolated instances.'" *Peterson*, 588 F.3d at 851 (quoting *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989)). And the prior incidents must be similar and specific: "prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Id.* (quoting *Est. of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005) (citation modified)).

Plaintiffs' allegations thus fall short. While the examples document misconduct by some officers—both before and during their Smith County employment—the examples are not sufficiently similar with one another or with Deputy Barnes's alleged conduct here to establish a "well-settled" pattern. *See, e.g.*, *Piotrowski*, 237 F.3d at 579. Rather, the examples in Plaintiffs' complaint are like those the Fifth Circuit has repeatedly found insufficient to establish a policy or custom. *See, e.g.*, *Hicks-Fields*, 860 F.3d at 810 (plaintiffs' evidence of a pattern was insufficient where "many of the constitutional deficiencies . . . are not on all-fours with those complained of by Plaintiffs"); *Gomez v. Galman*, 18 F.4th 769, 779 (5th Cir. 2021) (report of "issues" with "hiring and retention" was insufficient to show pattern or practice of unlawful hiring where the report "does not discuss specific conduct of officers like what is alleged here"); *Peterson*, 588 F.3d at 851–52 ("27 complaints of excessive force" did not show a pattern where the injuries suffered

"ranged from minor lacerations to broken bones" and failed to provide the context necessary to determine "whether [the] series of incidents can be called a pattern").

**b.**

Plaintiffs also seek to establish a County policy based only on Deputy Barnes's hiring and retention. *See* Docket No. 187 ¶¶ 244–47, 378–79; Docket No. 200 at 16–22. The Fifth Circuit has "recognized that 'a single decision by a policymaker may, under certain circumstances, constitute a policy for which [a municipality] may be liable.'" *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 366 (5th Cir. 2020) (quoting *Brown v. Bryan County*, 219 F.3d 450, 462 (5th Cir. 2000)). "But a plaintiff who brings a claim pursuant to this 'extremely narrow' 'single incident exception' must show (1) the hiring decision was made by a final policymaker, and (2) a 'plainly obvious consequence of the decision' is a constitutional violation." *Id.* (quoting *Brown*, 520 U.S. at 411). "To prevent municipal liability for a hiring decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged." *Brown*, 520 U.S. at 410. And it must be more than "indifference" to an applicant's background. *Id.* at 411. A plaintiff must allege that "a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.*; *see also Bryan County*, 219 F.3d at 460–61 ("[T]here must be a high degree of predictability concerning the consequences of the challenged decision[,]" including "evidence that would support a finding that it was obvious that

the offending officer in question was 'highly likely to inflict the particular injury suffered by the plaintiff.'").

Plaintiffs have not met this narrow exception here. Plaintiffs allege that Deputy Barnes began his career at the Fort Worth Police Department, where he "repeatedly failed exams and was ultimately dismissed" from the cadet academy, Docket No. 187 ¶ 223; "applied to numerous departments and was repeatedly not selected, disqualified, rejected, or screened out," *id.* ¶ 225; and was later hired by the Tyler Police Department, where "his record quickly became one of repeated misconduct, repeatedly policy violations and repeated disregard for citizens' Fourth Amendment rights," *id.* ¶ 226. At the Tyler PD, for example, Deputy Barnes allegedly failed to properly document or gather the required information in at least eighty-three incidents, *id.* ¶ 229; "frequently cursed at citizens and referred to them with racial epithets," *id.* ¶ 232; and was investigated for an unspecified "excessive force incident," *id.* ¶ 233. Tyler PD later "suspended Barnes without pay," and he resigned "rather than remain and face termination." *Id.* ¶ 233. Plaintiffs allege that Smith County then hired Deputy Barnes without conducting "the most basic scrutiny" of his employment background. *See id.* ¶¶ 244–48.

While these allegations suggest that Deputy Barnes may have been a poor candidate, they do not establish "that it was *obvious* that [Deputy Barnes] was 'highly likely'" to use deadly force. *Bryan County*, 219 F.3d at 461 (emphasis added) (quoting *Brown*, 520 U.S. at 412). Deputy Barnes's former problems involved administrative record-keeping failures and inappropriate behavior. In this way, the allegations are

similar to the record found insufficient in *Aguillard v. McGowen*, in which the Fifth Circuit held that "the record [was] bereft of evidence sufficient to impose liability on the County for wrongfully hiring [the Defendant.]" 207 F.3d 226, 231 (5th Cir. 2000). Like the officer in *Aguillard*, Deputy Barnes "never wrongfully shot anyone before," and "his record [did not] reveal him to be likely to use excessive force in general or possess a trigger-happy nature in particular." *Id.* at 230. *See also, e.g.*, *Snyder v. Trepagnier*, 142 F.3d 791, 797 (5th Cir. 1998) (quoting *Brown*, 520 U.S. at 411) ("[O]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the [hiring] decision . . . would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'").

Further, although Plaintiffs focus on Barnes's disciplinary history, he was also described by other officers as "mature for his age" with a "good mindset," a "go getter" officer with a "great reputation with [his] other coworkers," and "a good guy" with "great work ethic" and "great potential." Docket No. 187-38. At worst, therefore, Deputy Barnes's record was mixed, which is insufficient to establish a policy of unlawful hiring. *See Gros v. City of Grand Prairie*, 209 F.3d 431, 435 (5th Cir. 2000) (holding that the record failed to show an unlawful hiring policy based on a single incident where the officer's record was mixed and "the reprimands and complaints that *were* sustained [did] not meet *Brown*'s requirement of a 'strong' causal

connection between [Defendant's] background and the specific constitutional violations alleged").

Plaintiffs also allege that Smith County retained Deputy Barnes despite his misconduct as a County officer, but these allegations likewise do not establish that Barnes was highly likely to use deadly force. *See, e.g.*, Docket No. 187 ¶ 268 (Barnes allegedly "grabbed" a local attorney by the wrist and "behaved in an unprofessional manner during courthouse screening"); *id.* ¶ 269 (Barnes allegedly conducted "a traffic stop without probable cause"); *id.* ¶ 270 (Barnes allegedly "engaged in inappropriate personal contact with a woman whom he had arrested and jailed"); *id.* ¶ 274 (Barnes was allegedly "investigated or questioned concerning the purchase and subsequent resale of firearms"). As the Fifth Circuit held in *Gomez*, "the fact [that the officer] headbutted a car's mirror suggests that he is willing to improperly do damage to property," but it does not predict that he would use "aggressive physical violence toward a citizen." 18 F.4th at 778. So too here.

* * *

In sum, Plaintiffs' allegations do not demonstrate a County policy to hire or retain officers with disciplinary histories, much less a policy that is the "moving force" of the constitutional violation alleged here. *E.g.*, *Pineda*, 291 F.3d at 328.

**3.**

Plaintiffs also claim that Smith County had a practice or custom of failing to adequately train and supervise its officers. Docket No. 187 ¶¶ 384–95.

To succeed on a failure to train or supervise theory, a plaintiff must allege that "(1) the [County] failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Benfer v. City of Baytown*, 120 F.4th 1272, 1286–87 (5th Cir. 2024). Municipalities can be held liable only when their policymakers make "a deliberate choice to follow a course of action." *Goodman v. Harris County*, 571 F.3d 388, 396 (5th Cir. 2009) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). The failure to train must therefore "reflect[ ] a 'deliberate' or 'conscious' choice by a municipality." *Id.* (quoting *City of Canton*, 489 U.S. at 389). Further, a plaintiff cannot make broad, generalized allegations that an officer lacked training, but "must allege with specificity how a particular training program is defective." *Id.* at 395 (quoting *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005)).

Plaintiffs' failure-to-train/supervise allegations do not pass step one: They do not adequately state that the County failed to train or supervise Deputy Barnes. *Benfer*, 120 F.4th at 1286 (noting that the first element of a failure-to-train claim is that the municipality "failed to train or supervise the officers involved"). Plaintiffs allege generally that the County "did not provide Barnes meaningful hands-on use-of-force training beyond a basic online intermediate course." Docket No. 187 ¶ 254. And they contend that Smith County failed to administer de-escalation training or re-training based on the misconduct in Deputy Barnes's record. *Id.* ¶ 252. Plaintiffs

also claim generally that Barnes's record "demonstrates a lack of training and competence inconsistent with professional law enforcement standards" and that this was "a direct and moving force behind the unconstitutional use of deadly force against Jonathan Layton." *Id.* ¶ 263–64.

But Plaintiffs "made no attempt to identify a specific training program, point out particular deficiencies in that program, or explain why any lack of a formalized training program was constitutionally problematic." *Benfer*, 120 F.4th at 1287. "In order for 'liability to attach based on an "inadequate training" claim, a plaintiff must allege with specificity how a particular training program is defective.'" *Zarnow*, 614 F.3d at 170 (quoting *Roberts*, 397 F.3d at 293). And here, although Plaintiffs complain generally of Deputy Barnes's alleged inadequate training, they do not identify the "procedures used to train the officers" in Smith County or "the particular inadequacies of their Fourth Amendment training." *Id.* Rather, Plaintiffs appear to assume that, because Deputy Barnes unlawfully used force against Jonathan, Barnes must have received inadequate training. That kind of speculation is insufficient to support a failure-to-train claim. *See, e.g.*, *Hutcheson v. Dallas County*, 994 F.3d 477, 483 (5th Cir. 2021) (finding that plaintiffs' complaint was "speculative" and "conclusory" on the question of whether the municipality failed to train or supervise its officers); *see also Zarnow*, 614 F.3d at 170 (noting that the Fifth Circuit has repeatedly "rejected attempts by plaintiffs to present evidence of isolated violations and ascribe those violations to a failure to train").

Plaintiffs also admit that Deputy Barnes participated in basic training approved by the Texas Commission on Law Enforcement. Docket No. 187 ¶ 252. And "compliance with state requirements [is] a factor counseling against a 'failure to train' finding." *Zarnow*, 614 F.3d at 171. The mere fact that "additional training would have been helpful in making difficult decisions does not establish municipal liability." *Thompson ex rel. Neveah T. v. Martinez*, 789 F. Supp. 3d 491, 533 (W.D. Tex. 2025) (quoting *Connick*, 563 U.S. at 68).

Plaintiffs have therefore failed to plead sufficient facts to establish a failure-to-train claim.

**4.**

Finally, Plaintiffs allege that, shortly after the incident here, Sheriff Smith spoke to the media and "repeated a false narrative portraying Jonathan as the aggressor and portraying Barnes'[s] conduct as justified." Docket No. 187 ¶ 336. Plaintiffs further claim that "Barnes was returned to duty by SCSO without the sort of restriction, retraining, or discipline that a constitutionally adequate shooting review would have required." *Id.* ¶ 339. According to Plaintiffs, "[u]nder these extraordinary facts, post-incident ratification and failure to correct support an inference that the unconstitutional conduct was accepted as the way things are done." *Id.* ¶ 340 (citing *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985)).

In certain cases, a municipality may be held liable for "approv[ing] a subordinate's decision and the basis for it." *Peterson*, 588 F.3d at 848. But under Fifth Circuit precedent, this theory is available only in "extreme factual situations."

*Id.* (quoting *Snyder*, 142 F.3d at 798). And "a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality." *Id.*

Applying this precedent, the Court cannot say that the case here presents "an extreme factual situation." *Id.* This is not a case where, for example, the chief policy officer made "no reprimands, no discharges, and no admissions of errors" even though his officers "poured" gunfire onto a truck and killed an innocent person in an "incompetent and catastrophic performance." *Grandstaff*, 767 F.2d at 168, 171. Rather, the allegations here demonstrate that Deputy Barnes may have acted unlawfully, but not in such an obvious and brazen manner that Sheriff Smith's later defense of Barnes can be said to "ratify" an unconstitutional use of force. *See Snyder*, 142 F.3d at 798 (no ratification even though the municipality took no action after an officer shot a fleeing suspect in the back); *see also Peterson*, 588 F.3d at 848 (no ratification even though the police chief determined that the officers' unlawful conduct "complied with the department's policies").

As the Fifth Circuit explains, the ratification theory "has not enjoyed wide application in this Circuit." *Snyder*, 142 F.3d at 797. Nothing in this case justifies applying it here.

* * *

In sum, Plaintiffs have failed to allege sufficient facts to support any municipal liability claims. Defendants further argue that, in any event, Plaintiffs lack standing or capacity to subject Smith County to liability under the Texas Wrongful Death Act.

Docket No. 197 ¶ 20. Under that statute, the definitions of a "[p]erson" or "[c]orporation" do not cover counties, and Smith County is therefore not subject to suit under the Act. Thus, to the extent Plaintiffs seek to hold the County liable under the Texas Wrongful Death Act, their claims are barred under Texas law.

Count III is therefore dismissed.

**D.**

Count IV alleges that Sheriff Larry Smith is liable "in his individual capacity based on his own acts and omissions." Docket No. 187 ¶ 412. In particular, Plaintiffs claim that Sheriff Smith "personally participated in, approved, knew of, or consciously ignored the decisions and practices that resulted in Barnes'[s] hiring, retention, inadequate training, inadequate supervision, and return to duty." *Id.* ¶ 414. Plaintiffs also assert that Sheriff Smith "personally ratified Barnes'[s] conduct" to the public after the incident. *Id.* ¶ 417. Sheriff Smith asserts qualified immunity.

It is well-established that "[p]ersonal involvement is an essential element of a civil rights cause of action" under 42 U.S.C. § 1983. *Hinojosa*, 807 F.3d at 668 (quoting *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983)); *see Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452 (5th Cir. 1994) (en banc). Supervisors, therefore, are not liable for the conduct of their subordinates. *See Hinojosa*, 807 F.3d at 668. Instead, an official's liability depends upon his or her "own actions." *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (Under § 1983, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.").

Therefore, "[a] supervisory official may be held liable . . . only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (ellipsis in original) (quoting *Gates v. Tex. Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008)).

Plaintiffs' allegations do not state a constitutional violation against Sheriff Smith. Plaintiffs claim that Smith participated in the hiring and retaining of Deputy Barnes. But as noted above, Plaintiffs fail to explain how Barnes's hiring or retention was unlawful or caused the constitutional injury here. *See Porter*, 659 F.3d at 446. Although Plaintiffs note deficiencies in Barnes's record, none of these instances could have predicted Deputy Barnes's alleged misconduct here. *See Valle*, 613 F.3d at 547 ("Usually a plaintiff must show a pattern of similar violations, and in the case of an excessive force claim . . . the prior act must have involved injury to a third party."). Plaintiffs, moreover, claim that Sheriff Smith acted with deliberate indifference by hiring and retaining Deputy Barnes, but "[d]eliberate indifference requires a showing of more than negligence or even gross negligence." *Est. of Davis ex rel. McCully*, 406 F.3d at 381. And nothing in Plaintiffs' complaint demonstrates that Sheriff Smith acted with deliberate indifference in these circumstances. *See* Docket No. 187 ¶ 415 (alleging only that Sheriff Smith "knew or should have known of Barnes'[s] Tyler PD disciplinary history," etc.); *id.* ¶ 416 (alleging that Sheriff Smith "failed to impose meaningful restrictions" on Deputy Barnes even after his "post-hire misconduct gave actual notice" of risk).

Nor do Plaintiffs allege that Sheriff Smith is responsible for an alleged failure to train and supervise Deputy Barnes. To satisfy the requirements for this claim, Plaintiffs must allege that "(1) [Sheriff Smith] failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001). This is not an easy task, as "[d]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions." *Porter*, 659 F.3d at 446–47 (internal quotations omitted) (quoting *Connick*, 563 U.S. at 61). Plaintiffs therefore face a similar hurdle as in their municipal liability claim. *See Southard v. Tex. Bd. of Crim. Just.*, 114 F.3d 539, 551 (5th Cir. 1997).

Here, as noted above, Plaintiffs failed to allege that Deputy Barnes was inadequately trained or supervised. They have therefore not alleged that Sheriff Smith can be responsible for that non-failure. Nor have Plaintiffs alleged that Sheriff Smith disregarded that a known or obvious consequence of Smith County's training program would be the deadly force incident here. *Valle*, 613 F.3d at 547–48. And, finally, because Plaintiffs have not alleged the kind of "extreme factual situation[ ]" giving rise to a ratification claim, *see Peterson*, 588 F.3d at 848, Plaintiffs have not stated a ratification claim against Sheriff Smith individually.

Sheriff Smith is thus entitled to qualified immunity on Count IV.

**E.**

Count V alleges a Fourteenth Amendment due process claim against Sheriff Smith based on his interview with the media. Docket No. 187 ¶¶ 422–36. Defendants argue that Plaintiffs lack standing for this claim, and Sheriff Smith again invokes qualified immunity. Docket No. 197 at 6, 16–17.

Some courts have held that a plaintiff may assert a § 1983 claim for deprivation of liberty when a government employee makes false, stigmatizing statements. *See Wilcox v. City of Southlake*, 2026 WL 2123125, at *2 (N.D. Tex. July 23, 2026). These statements, however, must be accompanied by a tangible injury. *Id.* (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)). To prevail under the Fifth Circuit's stigma-plus framework, a plaintiff must allege *both* "the infliction of a stigma on [his] reputation by a state official" and "an infringement of some other interest." *Curtis v.* Sowell, 761 F. App'x 302, 305 (5th Cir. 2019) (quoting *Blackburn v. City of Marshall*, 42 F.3d 925, 935–36 (5th Cir.1995)).

To satisfy the first prong, "the plaintiff must prove that the stigma was caused by a *false* communication." *Id.* at 306 (quoting *Blackburn*, 42 F.3d at 936). In other words, the state actor must make a "concrete, *false* assertion[ ] of *wrongdoing on the part of the plaintiff*." *Blackburn*, 42 F.3d at 936. That false statement "must be worse than merely adverse; it must be such as would give rise to a badge of infamy, public scorn, or the like." *Wells v. Hico Indep. Sch. Dist.*, 736 F.2d 243, 256 n.16 (5th Cir. 1984) (internal quotations omitted). And "[t]o establish the infringement prong, a plaintiff must show that the state sought to remove or significantly alter a life, liberty,

or property interest recognized and protected by state law or one of the incorporated provisions of the Bill of Rights." *State of Tex. v. Thompson*, 70 F.3d 390, 392 (5th Cir. 1995).

Defendants first argue that Plaintiffs lack standing or capacity to prosecute this claim. To start, they contend that the Estate has standing only to prosecute an action based on wrongs suffered *before* Jonathan's death. Docket No. 197 ¶ 21. Defendants also argue that, under the Texas Wrongful Death Act, Nancy Layton has standing only to prosecute "an action for actual damages arising from an injury that causes an individual's death;" but here, Sheriff Smith's media comments did not cause Jonathan's death. *Id.* ¶ 22 (citing TEX. CIV. PRAC. & REM. CODE § 71.002).

Because the events that occurred after Jonathan's death can form no part of his § 1983 action, Defendants are correct that the Estate lacks standing to bring this claim. *See Whitehurst v. Wright*, 592 F.2d 834, 840 (5th Cir. 1979). Nancy Layton likewise cannot bring this claim under the plain text of the Texas Wrongful Death Act because Smith's comments did not cause Jonathan's death. Further, as explained below, Plaintiffs have failed to allege that Sheriff Smith made false statements about them and therefore have not shown that he violated any of their interests.

In any event, Plaintiffs' allegations are insufficient to plead a stigma-plus claim. In Plaintiffs' view, Sheriff Smith's interview with the media included "false assertions of criminal, violent, and morally blameworthy misconduct" that were ultimately "disseminated throughout the East Texas community." Docket No. 187 ¶ 424–25. Plaintiffs identify what they categorize as false statements in the

interview. But those statements reflect at most Sheriff Smith's views on Layton, *not* the wrongdoing of any other family member, including Nancy and Freddie Layton. Plaintiffs have therefore failed to allege that Sheriff Smith made false statements about them directly. In addition, Plaintiffs failed to state sufficient facts showing that Sheriff Smith violated any of Plaintiffs' other interests. Any reputational loss is purely speculative, and there is no indication that Sheriff Smith sought to impact Plaintiffs' life, liberty, or property interests through his comments. Finally, in any event, Plaintiffs do not identify any clearly established law that similar statements to the media violated the constitution. Sheriff Smith is thus entitled to qualified immunity on Count V.

Accordingly, Count V must be dismissed for lack of standing and insufficient pleading.

## IV.

As explained above, the Court **GRANTS IN PART** Defendants' motion to dismiss (Docket No. 197). Counts II, III, IV, and V are **DISMISSED with prejudice**. Count I may proceed. The Court will issue an Order Governing Proceedings forthwith.

So **ORDERED** and **SIGNED** this **6th** day of **November, 2026.**

JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE